IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KIMBERLY NORMAN,<br><br>Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 8:08CV118<br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on the Motion for Summary Judgment filed by defendant, Union Pacific Railroad Company (Union Pacific). For the reasons stated below, the motion is granted.

## I. PROCEDURAL BACKGROUND

On August 17, 2006, plaintiff, Kimberly Norman (Norman), filed a charge of discrimination with the Nebraska Equal Opportunity Commission (NEOC) alleging race, gender, and disability discrimination against Union Pacific. *(Filing No. 1, Complaint ¶ 26; Filing No. 14, Answer ¶ 26).* The NEOC reached a no cause determination on December 6, 2007. *(Id.)*. The United States Equal Employment Opportunity Commission (EEOC) issued Norman a right to sue letter on December 19, 2007. *(Id.).* Norman filed this action on March 18, 2008, bringing claims against Union Pacific for alleged violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. *(Complaint).* Norman specifically alleges Union Pacific inaccurately perceived Norman as suffering a mental health disability, and Union Pacific's faulty perception of Norman's mental health, as well as Norman's race and

gender, were motivating factors in Union Pacific's decision to terminate her.[1] *(Complaint ¶¶ 27-30, 35, 41).*

## II. FACTUAL BACKGROUND

The following facts are undisputed and construed in the light most favorable to Norman. On September 7, 1998, Union Pacific hired Norman, an African-American female, to work as a train dispatcher. *(Complaint ¶ 5; Supp. Br. 2, ¶ 1)*. Norman worked in the Harriman Dispatching Center in Omaha, Nebraska, where she was assigned to a geographical area of railroad track and was required to communicate directly with locomotive engineers to ensure the trains moved along the railroad track safely from one location to another. *(Filing No. 48, Brief in Support of Defendant's Motion for Summary Judgment (Supp. Br.) 2, ¶¶ 1-2; Filing No. 54, Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment (Opp. Br.) 2, ¶ 1).* A train dispatcher is analogous to an air traffic controller for trains; safety is crucial and attention to one's job is highly important or people may be hurt*.* *(Supp. Br. 3, ¶¶ 3-5; Opp. Br. 2, ¶ 1).*

Throughout the course of Norman's employment, Union Pacific offered its employees short term disability (STD) and long term disability (LTD) benefits. *(Supp. Br. 3, ¶ 9; Opp. Br. 2, ¶ 1).* Union Pacific's Disability Benefit Plan (Plan) provided STD benefits to those employees who were "temporarily unable to perform the essential functions of their regular jobs due to sickness or accident as determined by the Plan." *(Supp. Br. 3, ¶ 10; Opp. Br. 2, ¶ 1).* The Plan also provided LTD benefits for those employees who were unable to engage in their usual work for up to twelve months after being placed on LTD, and thereafter for those who were unable to engage in any work for which they were reasonably suited based upon their education, training, and experience. *(Supp. Br. 4, ¶ 12; Opp. Br. 2, ¶ 1).* The Plan limited LTD benefits to one year for those employees who had a disability which was caused by mental illness or a nervous disorder. *(Supp. Br. 4,*

---

[1]Norman does not allege Union Pacific discriminated against her on the basis of actual disability, nor does she assert a claim for wrongful termination of her disability benefits. *(Complaint)*.

*¶ 13; Opp. Br. 2, ¶ 1).* During Norman's employment with Union Pacific, Concentra Integrated Services (Concentra) was responsible for assisting the Plan in processing claims for disability benefits. *(Supp. Br. 4, ¶ 16; Opp. Br. 2, ¶ 1).*

In February 2001, Norman utilized Union Pacific's Plan and received STD benefits for approximately two weeks following a miscarriage. *(Filing No. 53-5, Norman Dep. 43-6).* After the two week leave, Norman returned to work until October 31, 2001, when she again took STD leave due to gynecological problems. *(Supp. Br. 6, ¶ 25; Opp. Br. 5, ¶ 8; Filing No. 53-5, Norman Dep. 45-6).* On November 9, 2001, Norman returned to work until she was placed on bed rest on December 7, 2001, because of a high-risk pregnancy. *(Supp. Br. 6, ¶ 25; Opp. Br. 5, ¶ 8; Filing No. 53-5, Norman Dep. 46-7).* Norman's leave was categorized as STD until May 27, 2002, when the status of her leave changed to LTD. *(Supp. Br. 6, ¶ 25; Opp. Br. 5, ¶ 8).* Norman's child was born on July 21, 2002, but Norman continued to have health problems post-pregnancy and remained on LTD until September 22, 2002. *(Supp. Br. 6, ¶ 25; Opp. Br. 5, ¶ 8; Filing No. 53-5, Norman Dep. 47-8).*

Union Pacific requires its train dispatchers who return from an extended period of leave to successfully complete a training course before actively returning to work as a train dispatcher. *(Supp. Br. 7, ¶ 27-8; Opp. Br. 2, ¶ 1).* As a result, when Norman returned to work on September 23, 2002, she was required to take training courses. *(Supp. Br. 7, ¶ 28; Opp. Br. 2, ¶ 1).* Norman completed the required training on October 11, 2002, and began actively working as a train dispatcher until December 14, 2002. *(Supp. Br. 6-7, ¶ 25, 28; Opp. Br. 2, ¶ 1; Filing No. 53-5, Norman Dep. 48-9).* During the period from September 23, 2002, until December 14, 2002, Norman took ten vacation days and two sick days. *(Supp. Br. 6, ¶ 26; Opp. Br. 2, ¶ 1).*

On December 14, 2002, Norman was again placed on bed rest for a high-risk pregnancy. *(Supp. Br. 6, ¶ 25; Opp. Br. 5, ¶ 8; Filing No. 53-5, Norman Dep. 48-9).* Norman was on STD status until April 18, 2003, and was then placed on LTD status until

July 27, 2003. *(Supp. Br. 6, ¶ 25; Opp. Br. 5, ¶ 8)*. After Norman's child was born, Norman attended two days of required training from July 28 to July 29, 2003. *(Supp. Br. 7, ¶ 28; Opp. Br. 2, ¶ 1; Filing No. 53-5, Norman Dep. 49).* Norman then took three days of bereavement leave from July 30 to August 1, 2003, and took nine days of vacation leave from August 4 until August 14, 2003. *(Supp. Br. 6, ¶ 26; Opp. Br. 2, ¶ 1; Filing No. 53-5, Norman Dep. 49)*. From August 15, 2003 through October 19, 2003, Norman took STD leave due to continuing gynecological problems. *(Supp. Br. 6, ¶ 25; Opp. Br. 5, ¶ 8)*.

Norman returned to work on October 20, 2003, and attended training for two days. *(Supp. Br. 7, ¶ 28; Opp. Br. 2, ¶ 1)*. On October 24, 2003, Norman returned to STD leave due to gynecological problems, and on November 3, 2003, Norman's status changed to LTD leave which continued until December 15, 2003. *(Supp. Br. 6, ¶ 25; Opp. Br. 5, ¶ 8*). Norman returned to work on December 17, 2003, attended training classes until January 27, 2004, and then worked as a train dispatcher until April 4, 2004. *(Supp. Br. 6-7, ¶ 25-8; Opp. Br. 2, ¶ 1 & 5, ¶ 8)*. During the time Norman was working, from December 17, 2003, through April 4, 2004, Norman took nine vacation days and two sick days. *(Supp. Br. 6, ¶ 26; Opp. Br. 2, ¶ 1)*. Norman returned to STD on April 5, 2004, after Norman was diagnosed with irritable bowel syndrome (IBS). *(Supp. Br. 6, ¶ 25; Opp. Br. 5, ¶ 8; Complaint ¶ 10).* On August 1, 2004, Norman's status was changed to LTD. *(Supp. Br. 6, ¶ 25; Opp. Br. 5, ¶ 8).* Norman continued to receive LTD benefits until February 6, 2006, when Norman's benefits ceased. *(Supp. Br. 6, ¶ 25; Opp. Br. 5, ¶ 8).* Throughout most of Norman's leave, Norman was considered a Union Pacific employee and was able to continue receiving employee benefits, including health benefits. *(Supp. Br. 5, ¶ 22; Opp. Br. 2, ¶ 1; Filing No. 53, Sullivan Dep. 114)*.

The parties dispute Norman's actual termination date. Norman claims her employment with Union Pacific was terminated on or about January 13, 2006. *(Complaint ¶ 21).* Union Pacific claims Norman's employment effectively was terminated on September 13, 2005, when Norman failed to provide Union Pacific a return to work release. *(Supp. Br. 8, ¶ 36).*

While Norman was receiving LTD benefits, the Plan concluded Norman's disability was caused by a mental illness, as defined by the Plan, and as a result, Norman's disability benefits could only continue for one year. *(Supp. Br. 7, ¶ 29; Opp. Br. 5, ¶ 9)*. On May 19, 2004, while Norman was receiving LTD, Union Pacific demanded Norman undergo an independent medical examination. *(Complaint ¶ 10)*. Norman attended the independent medical examination on or about July 21, 2004, and Norman discovered upon arrival that the medical examination was a psychological evaluation. *(Complaint ¶ 12)*. On August 12, 2005, Concentra sent Norman a letter informing Norman her LTD benefits had been terminated effective July 31, 2005. *(Supp. Br. 7, ¶ 30; Opp. Br. 5-6, ¶ 9)*. Norman made contact with Union Pacific and inquired about her status and asked if she should contact her physician for a return to work release. *(Supp. Br. 7-8, ¶ 31; Opp. Br. 6, ¶ 10; Filing No. 49-5, Ex. A9)*. A Union Pacific representative informed Norman that Union Pacific would continue to provide Norman disability benefits until September 2, 2005, and informed Norman, if she wished to return to work, she would need a return to work examination and release from a physician by September 2, 2005. *(Supp. Br. 8, ¶ 32; Opp. Br. 6, ¶ 10; Filing No. 49-5, Ex. A10)*.

Instead of seeking a return to work release, Norman appealed the termination of her benefits, arguing her disability was caused by a physical condition, not a mental illness, and therefore, her LTD benefits should not have terminated after one year. *(Supp. Br. 9, ¶ 39; Opp. Br. 2, 6-7, ¶¶ 1, 10*). Norman's appeal was reviewed by a delegate of the Plan Administrator and granted in part. *(Filing No. 49-5, Ex. A13).* The delegate concluded "Concentra incorrectly attributed [Norman's] right to receive LTD benefits to a mental illness or functional disorder on and after July 1, 2004. Instead, [the delegate found] that a physical condition (i.e., irritable bowel syndrome) was an independent reason justifying [Norman's] receipt of LTD benefits, at least through November 30, 2004." *(Id.).* Thus, the Plan delegate concluded the twelve-month period for which Norman was entitled to LTD benefits as the result of her mental illness or functional disorder began on November 30, 2004, and continued through November 30, 2005. *(Supp. Br. 9, ¶ 40; Opp. Br. 2, ¶ 1*;

*Filing No. 49-5, Ex. A13).* The delegate invited Norman to produce any further medical documentation which would support a finding of disability after November 30, 2005. *(Filing No. 49-5, Ex. A13).* Norman did provide further medical documentation from her physician supporting an additional diagnosis of endometriosis, and Norman's LTD benefits were extended through February 6, 2006. *(Supp. Br. 6, ¶ 25; Opp. Br. 10*; *Norman Dep. 258-59, 263-65).* In December 2005, Norman had a hysterectomy and, about a month later, became entirely symptom free of her IBS and endometriosis by late January or early February 2006. *(Filing No. 53-9, Norman Dep. 251-52; Opp. Br. 4, ¶ 6).*

Norman alleges that in 2004 and 2005 she asked Union Pacific to make reasonable accommodations to permit Norman to return to work. *(Complaint ¶ 17).* Norman requested that she not be reprimanded for being out of her seat to use the restroom, be given a consistent schedule to determine eating and medication intake, and have access to the restroom and the ability to be excused on days when her IBS symptoms were severe. *(Id.).* Norman asserts Union Pacific denied her request for reasonable accommodations, but Norman admits she was taking prescribed medication which prevented her from performing the essential functions of a train dispatcher until the end of 2005, and even with the requested accommodations, she could not work as a train dispatcher unless her medication was successfully modified. *(Supp. Br. 11-12, ¶¶ 46, 47; Opp. Br. 2, ¶ 1).* Norman never provided Union Pacific a return to work release, appealing the denial of her LTD benefits instead. *(Supp. Br. 8, ¶ 35; Opp. Br. 6-7, ¶ 10*; *Filing No. 53-9, Norman Dep. 296; Filing No. 53-10, Norman Dep. 306-07).*

Also during 2004 and 2005, while simultaneously receiving LTD benefits and certifying she was unable to work in any position for which she was reasonably qualified, Norman applied for several positions with Union Pacific. *(Supp. Br. 12, ¶¶ 48-9; Opp. Br. 2, ¶ 1; Filing No. 53-9, Norman Dep. 298-99).* In her deposition, Norman testified Union Pacific did not interview her for any of the positions for which she applied, and Norman did not know if she would have been able to work in any of the positions she applied for because of her medical conditions. *(Filing No. 53-10, Norman Dep. 301-05).* Norman

asserts Union Pacific denied her requests for reasonable accommodations but provided males and persons who were not African-American with reasonable accommodations, such as sedentary work, and assisted such persons in finding other positions for which they were qualified. *(Complaint ¶¶ 19-20).* Based upon these facts, Norman contends Union Pacific discriminated against her on the basis of her race, gender, and a perceived disability when Union Pacific terminated her. *(Complaint).*

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) instructs that a motion for summary judgment should be granted if, after consideration of the evidence, the court concludes "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The proponent of a motion for summary judgment bears the initial burden of notifying the trial court of the basis for its motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party is responsible for supporting its motion by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. In response to a properly supported motion, the opposing party must produce "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted). "[I]n ruling on a summary judgment motion, the Court views the facts in the light most favorable to the nonmoving party and allows that party the benefit of all reasonable inferences drawn from the evidence." Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).

## IV. ANALYSIS

### A. Statute of Limitations

Union Pacific argues "Norman's claims are barred by the statute of limitations because she failed to file her charge within 300 days of her termination." *(Supp. Br. 16).*

Under the ADA, 42 U.S.C. § 12117, and Title VII, 42 U.S.C. § 2000e-5(e), an employee must file a charge of discrimination within 300 days of the alleged discrimination. See Henderson v. Ford Motor Co., 403 F.3d 1026, 1032 (8th Cir. 2005). Union Pacific explains that on August 19, 2005, its Director of Employee Benefits sent a letter to Norman informing Norman her disability benefits had expired and if Norman was no longer disabled, Norman should contact Concentra and pursue a return to work release by September 2, 2005. *(Supp. Br. 16; Filing No. 49-5, Ex. A10).* The letter stated, "If you do not return to work subsequent to exhaustion of your LTD benefits, your employment relationship with Union Pacific will be terminated." *(Supp. Br. 16; Filing No. 49-5, Ex. A10).* Union Pacific maintains that because Norman failed to provide a return to work release from her physician by September 2, 2005, Norman was effectively terminated on that date. *(Supp. Br. 8, ¶ 36, & 16)*. This argument fails.

The Union Pacific letter states that Norman's failure to return to work, or provide a return to work release, by the exhaustion of Norman's LTD benefits would result in termination. *(Filing No. 49-5, Ex. A10).* It is undisputed Norman continued receiving LTD benefits until February 6, 2006. *(Supp. Br. 6, ¶ 26).* In a deposition, John Sullivan (Sullivan), a Union Pacific representative, testified Union Pacific's general policy is not to terminate employees who are appealing a denial of benefits. *(Filing No. 53-3, Sullivan Dep. 110-13).* Sullivan explained the purpose of this policy is so Union Pacific "can avoid having to potentially undo a termination if [the appellant is] successful on appeal." *(Filing No. 53-3, Sullivan Dep. 111).* When Sullivan was asked whether Norman's actual termination date was January 13, 2006, Sullivan responded, "That's probably, that sounds like that would be right." *(Filing No. 53-3, Sullivan Dep. 113-14).* During the deposition, Sullivan was asked to discuss Norman's status after the initial termination of her benefits, which occurred on September 2, 2005, and which Norman successfully appealed. Sullivan responded by stating, "[S]he kind of hung kind of in an unterminated but not certified status," and "she sat for a few months out there still, you know, getting the benefits of an employee. Although, I don't think we charged her any premium or things like that since she wasn't getting any pay." *(Filing No. 53-3, Sullivan Dep. 113, 114).* Union Pacific has failed

to set forth evidence demonstrating, as a matter of law, Norman's employment terminated on September 2, 2005. Because a genuine issue of fact exists regarding the date of Norman's termination, summary judgment is inappropriate on the statute of limitations ground.

**B. Americans with Disabilities Act**

The ADA provides, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "covered entity" is defined to include "an employer," and "[t]he term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(2) & (8). "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "A person is regarded as disabled if '(1) the employer mistakenly believes that the employee has an impairment (which would substantially limit one or more major life activity), or (2) the employer mistakenly believes that an *actual* impairment substantially limits one or more major life activity.'" Chalfant v. Titan Distrib., Inc., 475 F.3d 982, 988-89 (8th Cir. 2007) (quoting Wenzel v. Missouri-Am. Water Co., 404 F.3d 1038, 1041 (8th Cir. 2005)). "Major life activities are activities such as 'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" Id. at 989 (quoting Conant v. City of Hibbing, 271 F.3d 782, 784 (8th Cir. 2001) (per curiam)).

**1. Prima Facie Case**

Norman's sole claim under the ADA is Union Pacific inaccurately regarded Norman as having a mental disability, and Union Pacific's faulty perception of Norman's mental health was a motivating factor in its decision to terminate her. *(Complaint 5, ¶¶ 27-30).*

Because Norman does not present any direct evidence of disability discrimination, we evaluate her claim under the McDonnell Douglas burden shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under this analysis, "[t]he employee bears the initial burden of proving a prima facie case of discrimination." Dovenmuehler v. St. Cloud Hosp., 509 F.3d 435, 439 (8th Cir. 2007) (citing McDonnell Douglas, 411 U.S. at 802). To establish a prima facie case of disability discrimination, an employee must demonstrate, "(1) that the plaintiff has 'a disability within the meaning of the ADA;' (2) that he is qualified 'to perform the essential functions of the job, with or without reasonable accommodation;' and (3) that he suffered 'an adverse employment action due to a disability.'" Chalfant, 475 F.3d at 988 (quoting Wenzel, 404 F.3d at 1040).

To satisfy the first McDonnell Douglas prong—that Norman has a disability within the meaning of the ADA—Norman claims "Union Pacific regarded Norman as suffering a mental health disability that substantially limited Norman's ability to perform major life activities," and "Union Pacific's perception was inaccurate and it knew or should have known that such perception was inaccurate and unfounded." *(Complaint ¶¶ 27-8).* Thus, Norman's allegation, for our purposes here, satisfies the first prong of the prima facie case.

To satisfy the second prong, Norman contends, "Norman, at all times relevant, could perform the essential functions of her job and did not require or need treatment for mental health impairment." *(Complaint ¶ 29).* Norman claims she was able to perform the essential functions of her job because she was no longer disabled after her hysterectomy in December 2005 and before her termination in January 2006. *(Filing No. 53-9, Norman Dep. 251-52; Opp. Br. 4, ¶ 6).* Norman can arguably demonstrate Union Pacific regarded Norman as mentally disabled at that time, and in fact, Norman was able to perform the essential functions of her job as a train dispatcher.[2] *(Opp. Br. 11).* Thus, construing the

[2]Norman's claim that her physical disability ended and she was able to perform the essential functions of her job before her termination in January 2006 is somewhat contradicted by her deposition testimony that she had not fully recovered from her December 2005 surgery until late January or early February 2006. *(Filing No. 53-9,*

facts in the light most favorable to Norman, Norman's allegations are sufficient, for purposes of summary judgment, to create a genuine issue of material fact as to whether Norman could perform the essential functions of her job after her physical disability ended.

In support of the third McDonnell Douglas prong, Norman asserts "Union Pacific's faulty perception of Norman's mental health was a motivating factor in its decision to terminate her." *(Complaint ¶ 30).* The facts do not support Norman's assertion that Norman was terminated as a result of Union Pacific's faulty perception of Norman's mental health. Instead, the facts demonstrate Union Pacific informed Norman that in order for any employee who has been on an extended disability leave to return to work, such employee would need a release from a physician stating the employee is fit to return to work. *(Filing No. 53-10, Norman Dep. 305; Opp. Br. 6-7, ¶ 10; Supp. Br. 8, ¶ 33).* Norman admitted she did not seek a return to work release because she elected to appeal her denial of disability benefits instead, and because she did not want to deal with Concentra, the same agency which sent Norman to a psychiatrist and changed Norman's status to mental health disability after Concentra determined there was insufficient medical evidence to support a finding Norman had a physical disability. *(Filing No. 53-10, Norman Dep. 305-07; Opp. Br. 6-7, ¶ 10).* Norman has presented no evidence Union Pacific's alleged faulty perception of Norman's mental health had any impact on Union Pacific's decision to terminate Norman's employment. Because Norman has failed to set forth a prima facie case of disability discrimination, summary judgment is appropriate.

**2. Pretext**

Alternatively, assuming Norman's allegations alone were sufficient to establish a prima facie showing of disability discrimination, Union Pacific articulated a legitimate, nondiscriminatory reason for Norman's discharge, and Norman has failed to set forth any evidence to show Union Pacific's reasoning for her termination was pretextual. "Once an

---

*Norman Dep. 251-52; Opp. Br. 4, ¶ 6).* Additionally, Norman continued accepting LTD benefits until February 6, 2006, indicating she continued to be disabled until then.

employee presents a *prima facie* case of discrimination, the employer must articulate a legitimate, nondiscriminatory reason for the discharge" or other adverse employment action. Kosmicki v. Burlington N. & Santa Fe Ry. Co., 545 F.3d 649, 651 (8th Cir. 2008) (citation omitted). The burden then "shifts back to the employee to produce evidence that the employer's stated reasons are a pretext for discrimination." Id. (citation omitted).

Union Pacific relates Norman's termination was based upon Norman's excessive absences and Norman's refusal to provide Union Pacific with a return to work release following the exhaustion of her disability benefits. *(Supp. Br. 30)*. Norman has not produced any evidence to satisfy her burden of showing Union Pacific's stated reasons for Norman's termination "are a pretext for discrimination." Kosmicki, 545 F.3d at 651 (citation omitted). Norman acknowledges it is Union Pacific's policy to require all employees who take extended disability leave to provide a return to work release from a physician before the employee may return to work. *(Filing No. 53-10, Norman Dep. 305-07; Opp. Br. 6-7, ¶ 10; Supp. Br. 8, ¶ 33).* Such a policy, requiring a medical return to work release, is particularly necessary in the demanding and dangerous job of a train dispatcher. *(Supp. Br. 3, ¶¶ 3-5; Opp. Br. 2, ¶ 1).* Norman also admits she did not seek a return to work release before her disability benefits were exhausted. *(Id.).* Union Pacific had no way of knowing Norman had finally been cured and was ready to return to her position as train dispatcher because Norman repeatedly applied for LTD benefits by certifying she was unable to work, and Norman appealed the Plan's determination that she no longer qualified for benefits. *(Supp. Br. 9, ¶¶ 37, 39-40; Opp. Br. 2, ¶ 1*). Norman continued to receive benefits until February 6, 2006, and if Norman were able to return to work before that date, she should have notified Union Pacific of her change in status and sought a return to work release. Instead, Norman drafted a letter to Union Pacific after the expiration of her benefits asking "why [Norman] wasn't reinstated and [informing Union Pacific of] the hardship that was put on [Norman's] family due to the termination of [her] benefits . . . ." *(Filing No. 53-9, Norman Dep. 264)*. Aside from not wanting to deal with Concentra, Norman fails to provide any explanation as to why she did not provide a return to work release. *(Filing No. 53-10, Norman Dep. 305-07; Opp. Br. 6, ¶ 10).* Even if Norman had

stated a prima facie case of perceived disability discrimination, Norman has failed to demonstrate Union Pacific's stated legitimate reasons for Norman's termination were pretext for discrimination, and summary judgment is proper in favor of Union Pacific.

**3. Reasonable Accommodations**

Norman cites to several facts which she asserts support her claim of disability discrimination. These facts are not supported by the evidence in the record, nor do the facts lend credence to a "regarded as" disability claim. In her Complaint, Norman asserts,

> During 2004-05 Norman made a reasonable accommodation request of not being reprimanded for being out of her seat to use the restroom, to be given a consistent schedule to determine eating and medication intake, access to [the] restroom and the ability to be excused on days when the Irritable Bowl Symptoms [sic] were severe. Union Pacific refused the accommodation and reduced Norman's pay when she took leave.

*(Complaint ¶ 17)*. The court need not decide whether the accommodations Norman allegedly requested were reasonable because "an employee who is 'regarded as disabled' is not entitled to a reasonable accommodation." Finan v. Good Earth Tools, Inc., ___ F.3d ___, ___, No. 08-2221, 2009 WL 1375135, at *3 (8th Cir. May 19, 2009) (citation omitted). An employee who is regarded as disabled, but actually is not disabled, does not need any accommodation.

Although Norman's Complaint (¶ 29) alleges she "at all times relevant, could perform the essential functions of her job" without treatment, Norman admitted in her deposition she was taking prescribed medication which prevented her from performing the essential functions of the train dispatcher position through the end of 2005, and Union Pacific knew, based upon a letter from Norman's physician, that Norman could not return to her position as a train dispatcher, even with reasonable accommodations, because of the medication Norman was taking at the time Norman allegedly made the reasonable accommodation requests. *(Supp. Br. 11, ¶¶ 45-7; Opp. Br. 2, ¶ 1)*. The record presented by Norman demonstrates Norman was not able to return to work, with or without reasonable

accommodations, until January 2006, and at that time, Norman failed to provide a return to work release or notify Union Pacific of her change in status.

Norman also claims "Union Pacific denied Norman the opportunity to interview for other positions she applied for nor did they assist in finding her another position of which she was qualified for within the company." *(Complaint ¶ 20)*. During the time period in which Norman was applying for these positions, Norman simultaneously was applying for and receiving LTD benefits and asserting she was unable to work in any position for which she was reasonably qualified. *(Supp. Br. 12, ¶ 48-9; Opp. Br. 2, ¶ 1).* In her deposition, Norman admitted she did not know if she would have been able to work in any of the positions for which she applied due to her medical conditions. *(Filing No. 53-9, Norman Dep. 298-99; Filing No. 53-10, 301-05)*. When Norman was asked if she was able to work at all while she was on disability leave in 2002, 2003, 2004, and 2005, Norman responded, "I don't believe so." *(Filing No. 53-10, Norman Dep. 330-31)*.

In certain circumstances, employers may need to reassign a disabled employee to a new position within the company in order to fulfill the employer's responsibility to provide a reasonable accommodation. See Cravens v. Blue Cross and Blue Shield of Kansas City, 214 F.3d 1011, 1018-19 (8th Cir. 2000) (citation omitted). "Importantly, the employee must be otherwise 'qualified' for the reassignment position." Id. at 1019 (citation omitted). "To be considered 'qualified' for this job, the individual must 'satisfy the legitimate prerequisites for that alternative position, and . . . be able to perform the essential functions of that position with or without reasonable accommodations . . . .'" Id. (quoting Dalton v. Subaru-Isuzu Auto., Inc., 141 F.3d 667, 678 (7th Cir. 1998)).

Norman's only claim under the ADA is that Union Pacific regarded Norman as having a mental disability and terminated her on that basis. *(Complaint ¶ 30).* Under this "regarded as" theory, Norman cannot argue Union Pacific failed to provide her with reasonable accommodations. Finan, 2009 WL 1375135, at *3. Further, Norman has produced no evidence she was "qualified" for any of the other positions for which she

applied. In contrast, the evidence in the record establishes Norman was unable to work at the time Norman applied for the positions.

Norman received disability benefits until February 2006. Norman now claims that by January 2006 she was "symptom free of her irritable bowel syndrome problems which caused her disability leave and was able to return to work." *(Opp. Br. 4, ¶ 6)*. Yet, instead of seeking a return to work release, Norman sent a letter to Union Pacific expressing frustration that her benefits were not reinstated and explaining the hardship to her family arising from the termination of her benefits. *(Filing No. 53-9, Norman Dep. 264)*. Union Pacific was not required to continue to employ Norman in a state of perpetual uncertainty as to whether Norman would ever be able to return to work. "[A] request for an indefinite leave of absence . . . is not a reasonable accommodation under the ADA." Peyton v. Fred Stores of Arkansas, Inc., 561 F.3d 900, 903 (8th Cir. 2009) (citations omitted).

**C. Gender Discrimination**

Norman also claims her gender was a motivating factor in Union Pacific's decision to terminate her. *(Complaint 6, ¶¶ 32-5).* As in cases of alleged disability discrimination, when no direct evidence is presented in cases of alleged gender discrimination, courts evaluate such cases using the burden shifting framework established in McDonnell Douglas, 411 U.S. at 802. See, e.g., McGinnis v. Union Pacific R.R., 496 F.3d 868, 873-75 (8th Cir. 2007) (using McDonnell Douglas framework to evaluate a gender discrimination claim). "Under this test, the burden of persuasion never leaves the plaintiff, but there is a shift in the burden to come forward with evidence: (1) the plaintiff must present a prima facie case consisting of four distinct elements; (2) the defendant must rebut the prima facie case by showing non-discriminatory reasons for termination; and (3) the plaintiff must show the reasons are pretextual." Stacks v. Sw. Bell Yellow Pages, Inc., 996 F.2d 200, 202 (8th Cir. 1993).

"To establish a prima facie case of gender discrimination, [Norman] must establish (1) she was a member of a protected class, (2) she was qualified for her job, (3) she

suffered an adverse employment action, and (4) there are facts that give rise to an inference of gender discrimination." Holland v. Sam's Club, 487 F.3d 641, 644 (8th Cir. 2007) (citation omitted). Norman has satisfied the first prong because Norman is a female, and is therefore a member of a protected class. Norman also satisfies the second prong because Norman alleges she was qualified to perform her duties as a train dispatcher after Norman's physical disability ended. The third prong is also satisfied because, while Norman and Union Pacific dispute the date Norman was actually terminated, both parties agree Norman was terminated. Finally, to demonstrate a prima facie case of gender discrimination, Norman must show there are facts in the record that give rise to an inference of gender discrimination.

To support her claim of gender discrimination, Norman alleges Union Pacific provided "CC,"[3] a male employee who was employed as a train dispatcher and diagnosed with a mental illness, with more favorable treatment than it provided Norman. *(Complaint ¶¶ 19-25; Opp. Br. 13-4).* Norman asserts that when CC was on leave due to his mental disability, Union Pacific provided CC with assistance in returning to work in a non-safety sensitive position as a tape reader, and thus, Union Pacific treated CC more favorably than it treated her. *(Opp. Br. 13-4).* However, CC and Norman were not sufficiently similarly situated because CC sought and obtained a return to work release. (*Opp. Br. 13).* Norman never obtained such a return to work release. Without a sufficiently similar male employee comparison, Norman is unable to satisfy the fourth prong required to state a prima facie case of gender discrimination. The circumstances surrounding Norman's termination reveal Norman was terminated because she failed to provide a return to work release and had excessive absences, rather than for discriminatory reasons regarding her gender. Summary judgment is appropriate because there are no facts in the record that give rise to an inference of gender discrimination.

---

[3]The court refers to Norman's sole comparator as "CC" for confidentiality purposes.

Alternatively, even if Norman's allegations alone were sufficient to establish a prima facie showing of gender discrimination, Union Pacific articulated a legitimate, nondiscriminatory reason for Norman's discharge, specifically, that Norman failed to provide Union Pacific with a return to work release. Norman asserts Union Pacific's stated reason for her termination was a pretext for gender discrimination because the demand for her return to work release "was premised upon the termination of her mental disability," which Norman claims was false and lacked any merit. *(Opp. Br. 14).* Absent argument, Norman has failed to set forth any evidence supporting her assertion Union Pacific's reasoning for her termination was pretextual. Instead, the record clearly demonstrates Norman knew she was required to provide a return to work release by the expiration of her LTD benefits, and Norman failed to do so. Because no genuine issue of material fact exists to support a finding of pretext, summary judgment is appropriate.

**D. Race Discrimination**

Norman claims Union Pacific subjected Norman to race discrimination because Norman's African-American race was a motivating factor in Union Pacific's decision to terminate her. *(Complaint 6, ¶¶ 38-41).* "To establish a prima facie case of race discrimination, [Norman] must show: (1) she is a member of a protected class, (2) she was meeting her employer's legitimate job expectations, (3) she suffered an adverse employment action, and (4) 'similarly situated employees outside the protected class were treated differently.'" Shanklin v. Fitzgerald, 397 F.3d 596, 602 (8th Cir. 2005) (quoting Tolen v. Ashcroft, 377 F.3d 879, 882 (8th Cir. 2004)). If Norman succeeds in establishing a prima facie case, Union Pacific "must produce 'a legitimate, non-discriminatory reason for the adverse employment action.'" Id. (quoting Tolen, 377 F.3d at 882). "If [Union Pacific] meets its burden of production, 'the presumption raised by the prima facie case disappears, and the burden shifts back to [Norman] to show that the articulated reason was a pretext for discrimination.'" Id. (quoting Tolen, 377 F.3d at 882).

Norman satisfies the first three prongs of the prima facie analysis because Norman has demonstrated (1) she is an African-American; (2) when Norman was actually at work,

she met Union Pacific's legitimate job expectations and received positive reviews; and (3) Norman suffered an adverse employment action when she was terminated from her employment with Union Pacific. However, Norman has not established a prima facie case of race discrimination because Norman has failed to demonstrate that similarly situated employees outside her protected class were treated differently.

Norman alleges Union Pacific treated CC, a Caucasian employee, more favorably than Union Pacific treated Norman, in that Union Pacific allegedly assisted CC in obtaining a non-safety sensitive position while CC was still receiving assistance for his mental disability. *(Opp. Br. 13-4).* Norman claims CC and Norman are similarly situated because they both held the same job title and they were both categorized by Union Pacific as having a mental disability. *(Id.).* However, as discussed above, CC and Norman were not similarly situated in all respects because CC obtained a return to work release and Norman did not. Thus, Norman has failed to establish a prima facie case of race discrimination, and summary judgment is warranted.

Additionally, even if Norman could establish similarly situated employees in a non-protected class were treated differently, for the reasons stated previously, Norman has not produced any evidence which would show Union Pacific's stated legitimate reasons for terminating Norman were pretextual.

## V. CONCLUSION

Union Pacific's motion for summary judgment as to Norman's claims of disability, gender, and race discrimination is hereby GRANTED.

IT IS ORDERED:

1. Defendant Union Pacific's Motion for Summary Judgment *(Filing No. 46)* is granted, and all of Norman's above stated claims are dismissed with prejudice;

2. The Pretrial Conference set before Magistrate Judge Gossett on July 7, 2009, is cancelled; and

3. A separate Judgment will be entered.

DATED this 9th day of June, 2009.

BY THE COURT:

/s/ William Jay Riley
United States Circuit Judge
Sitting by Designation